United States District Court
Eastern District of Michigan
Southern Division

United States of America,

                    Plaintiff,                          Case No.
                                                        Hon.
v.
                                                        **Demand for Jury Trial**

One Hundred Thirty-Two Thousand,
Seven Hundred and Thirteen Dollars and
Seven Cents ($132,713.07) in funds seized
from bank account: XXXX9186 held in the
name of Louis Bitoff at Capital One Bank,
Richmond, VA; One Hundred Ninety-Four
Thousand, Five Hundred and Forty Six
Dollars and Seventy Four Cents
($194,546.74) in funds seized from bank
account: XXXXXXXXX7068 held in the
name of Louis and Bonnie Bitoff from JP
Morgan Chase, Houston, Texas; and Real
Property Located at 29560 Bradmoor Ct.,
Farmington Hills, Michigan,

                    Defendants *in rem*.

_____

## Complaint for Forfeiture

_____

        Plaintiff, the United States, by and through Dawn N. Ison, United States

Attorney for the Eastern District of Michigan, and K. Craig Welkener, Assistant

United States Attorney, states upon information and belief in support of this

Complaint for Forfeiture as follows:

## Introduction

1.      This is an *in rem* civil forfeiture action pursuant to Title 18, United

States Code, Sections 981(a)(1)(A) and/or (a)(1)(C).

2.      As detailed below, the three defendants *in rem* are funds from two

seized bank accounts and certain real property in Farmington Hills, Michigan.

These assets are subject to forfeiture as proceeds of a long-running healthcare

fraud scheme committed by Dr. Louis Bitoff, and due to involvement in related

money laundering offenses.

## Jurisdiction and Venue

3.      This Court has original jurisdiction over this forfeiture action pursuant

to Title 28, United States Code, Section 1345 as this action is being commenced by

the United States of America as Plaintiff.

4.      This Court has jurisdiction over this forfeiture action, pursuant to Title

28, United States Code, Section 1355(b)(1)(A), as the acts giving rise to forfeiture

occurred in the Eastern District of Michigan.

5.      Venue is proper before this Court pursuant to Title 28, United States

Code, Section 1391(b)(2) as a substantial part of the events or omissions giving

rise to the Plaintiffs claims occurred in the Eastern District of Michigan.

6.      Venue is also proper before this Court pursuant to Title 28, United States Code, Sections 1395 (a) and (b) as the action accrued and/or the Defendants *in rem* were found and seized in the Eastern District of Michigan.

## Defendants *In Rem*

7.      The Defendants *in rem* consist of the following:

a)      One Hundred Thirty-Two Thousand, Seven Hundred and Thirteen Dollars and Seven Cents ($132,713.07) in funds from bank account: XXXX9186 held in the name of Louis Bitoff at Capital One Bank, Richmond, VA (Defendant Currency 1);

b)      One Hundred Ninety Four Thousand, Five Hundred and Forty Six Dollars and Seventy Four Cents ($194,546.74) in funds seized from bank account: XXXXXXXXX7068 held in the name of Louis and Bonnie Bitoff from JP Morgan Chase, Houston, Texas (Defendant Currency 2); and

c)      Real property located at 29560 Bradmoor Ct., Farmington Hills, Michigan with the following legal description:

**UNIT 4 OF HICKORY OAKS CONDOMINIUM, A CONDOMINIUM ACCORDING TO THE MASTER DEED THEREOF RECORDED IN LIBER 20320, PAGES 367 THROUGH 445, OAKLAND COUNTY RECORDS, AND DESIGNATED AS OAKLAND COUNTY CONDOMINIUM SUBDIVISION PLAN NO. 1191, AND ANY AMENDMENTS THERETO, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON ELEMENTS OF SAID CONDOMINIUM AS SET FORTH IN SAID MASTER DEED AND ANY AMENDMENTS THERETO, LAST AMENDED BY AMENDMENT RECORDED IN LIBER 21222, PAGE 175, AND AS**

**DESCRIBED IN ACT 59 OF THE PUBLIC ACTS OF MICHIGAN, OF 1978, AS AMENDED**

**COMMONLY KNOWN AS: 29560 BRADMOOR COURT, FARMINGTON HILLS, OAKLAND COUNTY, MICHIGAN**

**PARCEL ID: 23-12-477-004**

d)     The Defendants *in rem* described in Paragraph 7(a) and 7(b) shall be referred to collectively as the "Defendant Currency."  The Defendant *in rem* described in Paragraph 7(c) shall be referred to as the "Real Property."

8.     The Defendant Currency was seized pursuant to a warrant issued by Magistrate Judge Patti.  It will continue to be in the custody of the United States Marshals Service.

9.     Defendant Real Property is in the Eastern District of Michigan.  The United States will comply with the requirements of 18 U.S.C. § 985(c), and thus "it shall not be necessary for the court to issue an arrest warrant in rem, or to take any other action to establish in rem jurisdiction over the property."  18 U.S.C. § 985(c)(3).

**<u>Statutory Basis For Civil Forfeiture</u>**

10.     Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture to the United States of any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of Title 18, or any property traceable to such property.

4

11.    Title 18, United States Code, Section 981(a)(1)(C) provides for the civil forfeiture to the United States of the proceeds of crimes designated as "specified unlawful activities" as defined in section 1956(c)(7), or a conspiracy to commit such offense.

12.    Title 18, United States Code, Section 984 provides:

> (a)(1) In any forfeiture action in rem in which the subject property is . . . funds deposited in an account in a financial institution . . .
> (A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and
> (B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

## Underlying Criminal Statutes

13.    18 U.S.C. § 1343 prohibits wire fraud:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

14.    18 U.S.C. § 1347, prohibits health care fraud:

> (a)    Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
> (1)    to defraud any health care benefit program; or
> (2)    to obtain, by means of false or fraudulent pretenses,

representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

15.     18 U.S.C. § 287 prohibits false, fictitious, or fraudulent claims against

the United States:

Whoever makes or presents to any person or officer in the civil . . . service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

16.     18 U.S.C. § 24(b), defines a "health care benefit program" as, among

other things,

any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan…

17.     18 U.S.C. § 1956(a) prohibits, inter alia, concealment money

laundering:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction, which in fact involves the proceeds of specified unlawful activity— …

(B) knowing that the transaction is designed in whole or in part —

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . [is guilty of money laundering.]

18.   18 U.S.C. § 1957(a) prohibits transactions involving over $10,000 in criminal proceeds:

Whoever, in any of the circumstances set forth in subsection (d) [the offense takes place in the United States among other locations], knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity . . .

is guilty of engaging in monetary transactions in property derived from specified unlawful activity.

19.   The definition of "specified unlawful activity" includes violations of 18 U.S.C. §§ 287, 1343, and 1347 under 18 U.S.C. § 1961(1)(B) and/or 18 U.S.C. § 1956(c)(7)(F).

## Facts Supporting Forfeiture of Defendants *in rem*

### THE MEDICARE PROGRAM

### A.      BACKGROUND

20.   The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services

("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

21.  Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

22.  Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

23.  The underlying fraud scheme in this case involves podiatry services which are covered by Medicare Part B.

24.  By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

## B.  MEDICARE BILLING/PROCEDURE CODES

25.  The American Medical Association assigns and publishes numeric

8

codes, known as the Current Procedural Terminology ("CPT") and Health Care Procedure Common Coding System ("HCPCS") codes. The codes are a systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

26.     The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b). They include codes for office visits, diagnostic testing and evaluation, and other services. Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

27.     Health care benefit programs, including Medicare, use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment. Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

28.     Health care providers often seek reimbursement from insurance carriers on CMS Form 1500. On the form, the provider identifies itself by its Provider Identification Number ("PIN") or Tax Identification Number ("TIN"), identifies the beneficiary who received the services, describes the illness or injury that makes the services medically necessary, and identifies the services provided by CPT and HCPCS codes. The insurance carrier will issue a payment or denial in response to the information contained in each CMS Form 1500.

29.     The Medicare Claims Processing Manual issued by CMS, is publicly available, and offers day-to-day operating instructions, policies, and procedures based on statutes and regulations, guidelines, models, and directives for Medicare Part B.

30.     The Medicare insurance program only pays for medical procedures that are "reasonable and necessary for the diagnosis or treatment of illness or injury," and generally excludes from coverage "routine foot care," defined in part as "trimming of nails" (Social Security Act § 1862, 42 U.S.C. § 1395y(l)(a)(13)(C)).

31.     Therefore, under most circumstances, podiatrists cannot bill Medicare for routine foot care. Some routine foot care procedures may be reimbursed by Medicare for certain patients with systemic diseases of sufficient severity that performance of such services by a non-professional person would put the patient at risk. Such routine foot care reimbursements under those codes are significantly lower than the reimbursements for nail avulsions. Therefore, even if some routine foot care may be reimbursable by Medicare, billing those procedures using a nail avulsion code constitutes a false claim.

32.     A nail avulsion is defined by Medicare as a "surgical procedure" that involves the separation and removal of a border of, or the entire nail, from the nail bed to the eponychium. The eponychium is the distal margin of the superficial layer of a proximal nail fold that is a band of epidermis extending over the base of a nail. It is often referred to as the cuticle. For this procedure to be considered a nail

10

avulsion, it must be performed using an injectable anesthesia except in the instances in which a patient is devoid of sensation or there are extenuating circumstances in which injectable anesthesia is not required or is medically contraindicated. Performing a nail avulsion can be billed to Medicare under CPT Codes 11730 and 11732.

| Procedure Code | Procedure Code - Long Description |
|---|---|
| 11730 | Avulsion of nail plate, partial or complete, simple |
| 11732 | Avulsion of nail plate, partial or complete, simple |

33. Furthermore, "trimming, cutting, clipping or debriding of a nail, distal to the eponychium, will be regarded as routine foot care. It is not appropriate to report CPT codes 11730/11732 when performing these services." (Medicare Local Coverage Determination #L26424 - Rev. Eff. 03/01/10).

34. Conversely, trimming or debriding of nails, if justified by a documented medical condition, can be billed to Medicare under CPT Codes 11719, 11720, and 11721.

| Procedure Code | Procedure Code - Long Description |
|---|---|
| 11719 | Trimming of non-dystrophic nails, any number |
| 11720 | Removal of tissue from 1 to 5 finger or toe nails |
| 11721 | Removal of tissue from 6 or more finger or toe nails |

## *OVERALL FRAUD SCHEME*

35.     In sum, MBA (a) submitted and caused the submission of false and

fraudulent claims to Medicare for services that were not medically necessary and/or

were not provided to Medicare beneficiaries; and (b) submitted and caused the

submission of false and fraudulent claims to Medicare for services beyond what was

actually performed on the beneficiary, a practice which is also known as upcoding.

36.     Medicare records indicate that Bitoff has been a Medicare enrolled

provider since at least 2006. As recent as October 2016, Bitoff certified to Medicare

that he would comply with all Medicare rules and regulations, including that he

would not knowingly present or cause to be presented a false and fraudulent claim for

payment by Medicare and would comply with the federal Anti-Kickback Statute.

37.     Instead, Bitoff repeatedly trimmed patients' nails, then caused MBA

to falsely bill Medicare for nail avulsions which had not occurred.

## A. MEDICARE CLAIMS ANALYSIS

38.     Analysis of Medicare Part B data reveals that from January 2010

through November 2019, MBA, utilizing PIN 0N35420, billed Medicare Part B

approximately $4,974,635.05 for services purported to be provided by Bitoff. Medicare

paid MBA approximately $2,501,477.02 for these claims.

39.     During the same time frame, MBA, on behalf of Bitoff, billed Medicare

Part B approximately $2,170,875.00 for CPT 11730 (separation of nail plate from nail

bed, also known as a nail avulsion) for services purportedly provided by Bitoff. Medicare paid MBA approximately $1,232,755.57 for these claims. MBA billed Medicare for approximately 17,311 separate CPT 11730 claims.

40.     During the same time frame, MBA, on behalf of Bitoff, billed Medicare Part B approximately  $1,195,675.00 for CPT 11732 (separation of nail plate from nail bed, also known as a nail avulsion) for services purportedly provided by Bitoff. Medicare paid MBA approximately $483,323.27 for these claims. MBA billed Medicare for approximately 17,430 separate CPT 11732 claims.

41.     The following table summarizes MBA's billings  to Medicare for claims relating to CPT codes 11730 and 11732 on behalf of Bitoff from January 2010 to November 2019:

| CPT Code | Number of Claims | Amount Billed | Amount Paid |
|----------|------------------|---------------|-------------|
| 11730 | 17,311 | $2,170,875.00 | $1,232,755.57 |
| 11732 | 17,430 | $1,195,675.00 | $483,323.57 |
| **Total** | **34,651** | **$3,366,550.00** | **$1,716,079.14** |

42.     CMS—through a provider of investigative services—performed a peer comparison of all podiatrists billing CPT Code 11730 in the Midwest Region of the United States of America between January 2010 and January 2019. The peer comparison revealed that Bitoff billed the most to Medicare for procedure 11730

over every other podiatrist in the Midwest Region of the United States in this timeframe.

43. Additionally, below is a summary of all the nail trimming or debridement claims billed under the appropriate CPT codes by MBA on behalf of Bitoff. In summary, between January 2010 and November 2019, Bitoff billed nearly the same number of claims for CPT codes of 11719, 11720, and 11721 in total as the amount for claims for CPT codes 11730 and 11732. Bitoff did not bill Medicare for any claims of CPT 11719. Bitoff billed 168 total claims for 11720, and 16,787 total claims for 11721. In total, MBA was paid $555,207.21 for these claims. The following table summarizes MBA's billings to Medicare for claims relating to CPT codes 11719, 11720 and 11721 on behalf of Bitoff from January 2010 to November 2019:

| CPT Code | Number of Claims | Amount Billed | Amount Paid |
|---|---|---|---|
| 11719 | 0 | $0.00 | $0.00 |
| 11720 | 168 | $8,925.00 | $3,812.68 |
| 11721 | 16,787 | $1,141,272.00 | $551,394.53 |
| **Total** | **16,955** | **$1,150,197.00** | **$555,207.21** |

44. The nearly identical number of claims associated with CPT Codes 11719, 11720, and 11721 compared to the number of claims associated with nail

avulsions, under CPT Code 11730 and 11732 (approximately 17,000 for each code), is a possible indication of upcoding and billing for services not rendered. In short, it appears from that data that Bitoff simply added on nail avulsion billing, and often times a second nail avulsion, 11732, when he was only trimming and debriding his patients' nails by billing a CPT Code for nail avulsion, which has a higher reimbursement rate than the CPT Code for nail debridement.

45.     A sample of Bitoff's patients have been interviewed and advised investigators that they have not received, nor required treatment for procedure codes 11730 and 11732.

### B.       WITNESS INTERVIEWS
#### *PATIENT B.W.*

46.     B.W. was interviewed by special agents of the FBI and HHS-OIG on January 27, 2020.

47.     B.W. said he/she was a patient of Bitoff from 2010 until 2016 when he/she started seeing podiatrist Dr. Cary Wolf. B.W. said he/she saw Bitoff every two to three months. B.W. further explained that he/she is diabetic and sees Bitoff so he can "check his/her feet," and trim his/her toenails.

48.     B.W.'s spouse supervises his/her treatment and performs any required aftercare because B.W. is unable to reach his/her feet. Both stated that Bitoff has only performed one nail avulsion which was on his/her right big toe. B.W. advised that he/she has lost some feeling in his/her feet and can't always feel a light touch

but certainly still feels pain.

49.     Between February 2010 and June 2016, Bitoff, via MBA, billed Medicare, on behalf of B.W., for 34 nail avulsions, CPT 11730, and 33 nail avulsions billed under CPT 11732, purportedly performed by Bitoff. MBA billed Medicare $6,560.00 and was paid $3,461.85 in connection with those claims.

50.     Since being treated by Dr. Cary Wolf, B.W. has not had any nail avulsions and has simply been billed for nail debridements and an evaluation.

### PATIENT M.N.

51.     M.N. was interviewed by special agents of the FBI and HHS-OIG on February 27, 2020.

52.     M.N. said he/she has been a patient of Bitoff's since before 2010 and still presently sees him. M.N. says he/she doesn't set appointments with Bitoff and that every three months she simply receives a call the day before explaining Bitoff will come out to his/her home.

53.     M.N. said Bitoff has never removed a toenail, given him/her any anesthetic, or given him/her an injection into his/her toes. M.N. confirmed he/she has full feeling in his/her feet.

54.     M.N. says he/she reviews all of her Medicare explanations of benefits ("EOB") and is surprised how much Bitoff is paid for a ten minute appointment.

55.     Since January of 2010, Bitoff via MBA, has billed Medicare, on behalf of M.N., for 43 nail avulsions, CPT 11730, and 44

nail avulsions billed under CPT 11732, purportedly performed by Bitoff.
MBA billed Medicare $8,345.00 and was paid $4,282.98 in connection
with those claims.

### PATIENT C.B.

56.    C.B. was interviewed by special agents of the FBI and HHS-OIG on
January 27, 2020.

57.    C.B. said he/she has been a patient of Bitoff since before 2010 and still
currently sees him every two to three months. C.B. said Bitoff only trims his/her
nails for length and checks his/her feet. C.B. said Bitoff has never removed a toenail
or administered any kind of injection into his/her toes. C.B.'s caretaker, C.H., was
present for the interview and confirmed that C.B. has never had a nail avulsion. C.H.
said he/she is responsible for all of C.B.'s aftercare and has never been instructed by
Bitoff regarding any aftercare. Both stated the appointments only last five to ten
minutes.

58.    Since January of 2010, Bitoff, via MBA, has billed Medicare, on behalf
of C.B., for 34 nail avulsions, CPT 11730, and 35 billed under CPT 11732
purportedly performed by Bitoff. MBA billed Medicare $6,695.00 and was paid
$3,480.66 in connection with those claims.

### PATIENT M.M.

59.    M.M., and his/her adult child B.Z., were interviewed by special agents of
the FBI and HHS-OIG on January 8, 2020. B.Z. explained that the two live together

and B.Z. is present for all of M.M.'s medical treatment.

60.    M.M. has been a patient of Bitoff since at least 2010 and still currently sees him every two to three months for regular foot checkups. M.M. does not have diabetes and Bitoff trims his/her nails for length and grinds down some of the thickness of his/her nails. After being provided of the description of a nail avulsion procedure, B.Z. indicated that he/she watches the procedures that Bitoff performs on M.M. and that M.M. has never got a nail avulsion. Further, B.Z. would be the person responsible for changing M.M.'s dressings after such a procedure.

61.    M.M. and B.Z. said that Bitoff has never given M.M. an injection in his/her foot or applied a numbing agent to M.M.'s feet, has never cut M.M.'s toe nails near the base of the nail or the cuticle, and has never bandaged M.M.'s feet. M.M. has never had any blood or oozing come from his/her toenails after Bitoff trimmed his/her nails.

62.    Since January of 2010, Bitoff, via MBA, has billed Medicare, on behalf of M.M., for 42 nail avulsions, CPT 11730, and 45 billed under CPT 11732 purportedly performed by Bitoff. MBA billed Medicare $8,300.00 and was paid $4,407.12 in connection with those claims.

### *BITOFF INTERVIEW*

63.    On July 14, 2020, Bitoff was interviewed on a recorded telephone call by a field investigator from Blue Cross Blue Shield ("BCBS").

64.    During the interview, Bitoff advised BCBS that he began working for

MBA in 2006.

65.     Bitoff described a nail avulsion as a procedure that requires a tool to get under the nail back to the nail matrix, then you use forceps to "yank that baby out." Bitoff advised that prior to the procedure, a topical refrigerant and antiseptics are used on the patient. After pulling the nail out with forceps, a dressing is applied if the patient is hemorrhaging or taking an anti-coagulant.

## C.     FINANCIAL ANALYSIS

66.     As part of this investigation, FBI obtained and reviewed MBA's and Louis Bitoff's financial records. The accounts listed below contain or contained funds derived, directly or indirectly, from proceeds traceable to the commission of a federal health care offense and/or constitute funds involved in, or traceable to funds involved in, money laundering.

67.     The below chart list the accounts identified as receiving fraudulently obtained funds, either directly or indirectly. The chart contains a "Tier" designation column indicating the manner in which the account received Medicare funds. An account with a "Tier One" designation received direct deposits of Medicare funds as a result of fraudulently submitted claims. An account with a "Tier Two" designation received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from a "Tier One" account. Ensuing tiers were similarly designated. The following accounts contain funds

19

derived, directly or indirectly, from proceeds traceable to the commission of a federal health care offense and/or involved in money laundering, with the accounts where Defendant Currency was seized in bold:

| Financial Institution | Account # | Account Name | Tier |
|---|---|---|---|
| JP Morgan Chase | 744203753 | Mary E. Barna, DPM, and Associates, P.C. | 1 |
| **JP Morgan Chase** | **215000577068** | **Louis and Bonnie Bitoff** | **2** |
| **Capital One** | **55289186** | **Louis Bitoff** | **3** |

### A. Tier One Account

68.    Records from JP Morgan Chase Bank show that Account #744203753 ("Chase #3753"), in the name of Mary E. Barna, D.P.M. and Associates, P.C, was opened December 6, 2013, and has signatory Mary E. Barna.

69.    Records show that Chase #3753 received deposits totaling $5,201,715.46 in a series of 1678 transactions from January 2013 to May 2020 from designation "Wps Hcclaimpmt." It is believed that designation refers to Wisconsin Physician Services health care claim payment. An online search reflects that Wisconsin Physician Services provides claims processing and customer service for Centers for Medicare and Medicaid Services. Because Wisconsin Physician Services provided Medicare funds to Chase #3753, that Chase account is deemed an electronic funds repository account for receipt of direct payment for services from Medicare and, as such, it is a Tier One account. Investigators did not identify any other bank accounts

into which Medicare deposited reimbursements for nail avulsions purportedly performed by Bitoff and billed under CPT codes 11730 and 11732.

70.    As stated above, Medicare paid MBA approximately $1,232,755.57 for approximately 17,311 nail avulsions purportedly performed by Bitoff under CPT 11730 and approximately $483,323.27 for approximately 17,430 nail avulsions purportedly performed by Bitoff under CPT 11732 between January 2010 and November 2019.

71.    A further review of bank records shows that Chase #3753 was used to pay business expenses, including salaries, and that numerous salary, bonus, and/or other payments appear to have been made to Louis Bitoff.

72.    Given the facts obtained during this investigation and set forth herein, it appears that Louis Bitoff fraudulently billed Medicare and that Medicare deposited payments for these fraudulent billings into Chase #3753, which were then transferred to Bitoff as salary payments. As a result, Chase #3753 contained proceeds of wire fraud, health care fraud, and fraudulent claims, in violation of 18 U.S.C. §§ 1343, 1347, and 287.

### B.    Tier Two Account (Defendant Currency 1)

73.    Records from Chase Bank show that Account #215000577068 ("Chase #7068") in the name of Louis or Bonnie J. Bitoff, was opened June 4, 1997, and has Louis and Bonnie J. Bitoff as signatories. Bonnie Bitoff is believed to be the spouse

of Louis Bitoff.

74.     Records from Chase Bank also show that from January 1, 2013, to May 29, 2020, in a series of 185 transactions, $1,263,478.18 was moved from Tier One Chase #3753 into Chase #7068. Because of these transfers, Chase #7068 is a Tier Two account. Most of these transfers are designated on statements for Tier Two Chase #7068 as "Mary E. Barna D Payroll" and they generally occur every two weeks.

75.     Given the facts obtained during the investigation of this matter, and set forth herein, it appears that the $1,263,478.18 deposited into Tier Two Chase #7068 from Tier One Chase #3753 was derived, directly or indirectly, from gross proceeds traceable to Medicare reimbursements obtained through wire fraud, health care fraud, and fraudulent claims in violation of 18 U.S.C. §§ 1343, 1347, and 287. As a result, Defendant Currency from this account is subject to forfeiture under 18 U.S.C. § 982(a)(7) and/or 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c).

### C.      Tier Three Account (Defendant Currency 2)

76.     Records from Capital One show that Account #55289186 ("Capital One #9186"), in the name of Louis Bitoff was opened on October 25, 2006.

77.     Records from Capital One and/or Chase Bank show that from February 28, 2013 to June 15, 2020, in a series of 89 transactions, $113,387.44 was moved from Tier Two Chase #7068 into Capital One #9186. Because of these transfers

from a Tier Two account, Capital One #9186 is deemed a Tier Three account.

78.    One of the transfers, made on September 13, 2019, exceeded $10,000.

79.    Given the facts obtained during the investigation of this matter, and set forth herein, it appears that the $113,387.44 deposited into Tier Three Capitol One #9186 from Tier Two Chase #7068 were derived from Medicare reimbursements traceable to wire fraud, health care fraud, or fraudulent claims in violation of 18 U.S.C. §§ 1343, 1347, and 287, respectively.

80.    It also appears that the funds transferred from Tier Two Chase #7068 to Tier Three Capitol One #9186 were involved in violations of 18 U.S.C. §§ 1956 and 1957 because Bitoff commingled the transferred funds with other funds in Capitol One #9186 and because a $25,000.00 transfer into this account on September 13, 2019, constituted a monetary transaction involving criminally derived funds with a value greater than $10,000.

81.    As a result, all funds on deposit in Capital One #9186 are subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C), and 982(a)(1).

**D.        Defendant Real Property**

82.    As recounted above, Dr. Bitoff engaged in the underlying fraud scheme from 2013-2020.

83.    An analysis of bank and mortgage records reflects that from 2013 to 2020, Bitoff used over $208,000 in criminal proceeds from his Tier Two Chase

Bank account no. 215000577068 to pay down his home mortgage on Defendant Real Property.

84.     Given the facts obtained during the investigation of this matter, and set forth herein, it appears that the monies used to pay for Bitoff's home from the Tier Two Chase #7068 account were derived from Medicare reimbursements traceable to wire fraud, health care fraud, or fraudulent claims in violation of 18 U.S.C. §§ 1343, 1347, and 287, respectively.  Defendant Real Property is subject to forfeiture on this basis.

85.      It also appears that Defendant Real Property was involved in violations of 18 U.S.C. § 1956 because Bitoff commingled the proceeds of his offenses with other equity in the property, intending to conceal the nature, location, source, ownership, or control of his fraud proceeds.  Defendant Real Property is also subject to forfeiture on this basis.

## CLAIM FOR RELIEF

86.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

87.     The defendants *in rem* are forfeitable to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) because they constitute or were derived from property involved in money laundering, and or pursuant to Title 18, United States Code, Section 981(a)(1)(C) as gross proceeds of

a scheme to defraud Medicare, and/or are property traceable to the proceeds of illegal activity.

## Demand for Jury Trial

Plaintiff respectfully requests a trial by jury in this case.

## Conclusion and Relief

Plaintiff respectfully requests that a warrant for arrest of the Defendant Currency *in rem* be issued; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* to be condemned and forfeited to the United States for disposition according to law; and that the United States be granted such other further relief as this Court may deem just and proper together with costs and disbursements of this action.

Respectfully submitted,

Dawn N. Ison
United States Attorney


*/s/ K. Craig Welkener*
K. Craig Welkener
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-0248
Kenton.welkener@usdoj.gov
DC Bar No. 1033585

Date: November 15, 2022

## **VERIFICATION**

I, Todd Fry, state that I am a Special Agent of the Federal Bureau of Investigation ("FBI").  I have read the foregoing Complaint for Forfeiture and declare under penalty of perjury that the facts contained therein are true and correct to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents and employees of the United States Government.

Todd Fry
Special Agent
Federal Bureau of Investigation

Dated:   November 15, 2022

26